UNITED STATES of America, Plaintiff,

v.

The LEASEHOLD INTEREST IN 121 NOSTRAND AVENUE, APARTMENT 1–C, BROOKLYN, NEW YORK, Defendant,

and

Clara Smith, on behalf of herself and as next friend of Tara Smith, Anthony Smith, Marcus Smith, Kevin Smith, Kelima Smith, Quentay Smith, Jamele Smith, Nicole Smith, Ramel Smith, Fatima Smith, Jasmine Carr, Shawn Lindsy, Shonda Lindsy, and Melissa Smith, Intervenors–Claimants.

No. 90 Civ. 1607.

United States District Court,
E.D. New York.

March 26, 1991.

Andrew J. Maloney, U.S. Atty., E.D.N.Y. by Lisa M. Burianek, Stephen J. Riegel, Brooklyn, N.Y., for plaintiff.

Sullivan and Cromwell by Phillip L. Graham Jr., John E. Kirklin, Geoffrey Potter,

**1018**

Frank T. Herdman, New York City, for intervenors-claimants.

MEMORANDUM AND ORDER

WEINSTEIN, District Judge:

## TABLE OF CONTENTS

I. Introduction

II. Procedural Background

III. Facts

 A. Household Members
 B. Connection of Household to Drug Activity
 C. Clara Smith and the Apartment

IV. Law

 A. Public Housing Forfeiture
 B. Preseizure Notice and Hearing Required
 C. Procedures to Obtain Forfeiture
 1. Adequate Notice
 2. Claimants' Objection
 3. Scope of Preseizure Hearing
 D. Probable Cause to Forfeit
 E. Defenses to Forfeiture
 1. Burdens of Proof
 2. Innocent Ownership
 3. No Unlawful Activity
 4. Fifth Amendment
 F. Forfeiture of Other Claimants' Interests

V. Conclusion

---

## I. INTRODUCTION

The Government seeks to enforce an anti-drug forfeiture statute (21 U.S.C. § 881) against occupants of an apartment in a city-run housing project for the poor. By reducing the number of locations from which illegal narcotics are sold, the recently adopted law is expected to help alleviate the nation's drug problem and to increase the well-being and safety of occupants of public housing.

Drugs and drug-related crime are widespread in low-income housing. Dwellers in public housing need relief from the presence of drug sellers and buyers in and near their homes. Evicting drug dealers from their apartments, it is hoped, will make housing projects safer and more decent.

This case reveals some of the limitations of apartment forfeiture as a means of eliminating drugs from public housing complexes. For the poor, the shortage of livable, low-priced housing is especially acute. Tenants—and especially their minor children—who are evicted are likely to become homeless, with whatever stability their lives afforded seriously jeopardized.

For reasons stated below, the owner of the defendant leasehold is entitled to retain her home. Her children, grandchildren and great-grandchildren, who look to her for shelter as the family's matriarch, may not be dispossessed because one of them has sold drugs from their apartment. That person may, however, be forced from the apartment since it was illegally used by her as a base for her own illicit drug activities. An injunction against future illegal use will be granted.

## II. PROCEDURAL BACKGROUND

On May 10, 1990, the United States filed this civil forfeiture action pursuant to 21

U.S.C. § 881(a)(7) against the defendant leasehold, Apartment 1–C, 121 Nostrand Avenue, Brooklyn, New York. The apartment was allegedly used to facilitate the sale or distribution of narcotics.

By order to show cause, the Government requested warrants for the arrest *in rem* and for interim seizure of the leasehold. It served a copy of the order to show cause, the verified complaint *in rem* and declarations with attached exhibits on Mrs. Clara Smith, a potential claimant to the leasehold and responsible resident of the apartment.

A hearing on the order to show cause was held on May 22nd. The court ordered *pro bono* counsel appointed for Mrs. Smith and her progeny. Further proceedings were postponed until appointed counsel had consulted with their clients. The court notes that these uncompensated counsel have, in the highest tradition of the bar, served their clients with great skill.

By letter of July 9th, the Government requested an expedited hearing to obtain interim seizure of the apartments. In light of the novel and complex legal issues, counsel for potential claimants requested additional time in which to file motions and to respond to the request for interim relief. On July 30th the court ordered that motions for intervention or interim relief be filed by August 22nd and be made returnable on September 7th. The stay of further proceedings was continued.

To correct a possible defect in service, the Government posted supplemental warrants for arrest *in rem* and a second copy of the verified complaint at the apartment on August 2nd. A "Notice of Attachment," which provided that the apartment would remain in the custody of the United States Marshal until the claim was settled or a bond was furnished, was also posted.

By order to show cause, the potential claimants sought to have the August 2nd warrant and notice of attachment vacated. Pursuant to a stipulation dated August 6th, the notice of attachment was withdrawn, and the date for filing of motions for intervention or interim relief was extended to September 10th. The Government published legal notice of the arrest of the defendant leasehold on August 7th, 8th, and 9th in a newspaper of general circulation within this district.

Clara Smith, the leaseholder of apartment 1–C, by notice of motion dated September 10th moved to intervene in the forfeiture proceedings on behalf of herself and any minor children living in the apartment. The proposed verified intervenor complaint, while nominally brought under Rule 24(a) of the Federal Rules of Civil Procedure, was also intended to serve as a verified notice of claim under the rules governing forfeiture proceedings. The proposed claimants sought a stay of discovery and of further proceedings until their Fifth Amendment privileges were given full protection in related and threatened criminal drug prosecutions. They also requested a ruling on the scope and effect of any defenses available at the interim seizure hearing.

On September 26th, the court heard argument on the availability of intervention and the request for interim relief. After taking judicial notice of the extreme public housing shortage in New York City and the likelihood that dispossession would lead to homelessness, the following tentative, interim rulings were issued:

1. The leaseholders have a property interest under New York law and under the statute. It gives the equivalent, for our purposes, of the real property interest of the owner of a home....

2. Other legal occupants ... have property interests equivalent to the leaseholders. That includes minors in residence.

3. An intervention right exists and the procedure used here by the intervenors is a satisfactory method of filing a proof of claim.

4. The innocent occupant defense is available to ... leaseholders and the other occupants.

5. Fifth Amendment protections are entitled to substantial consideration....

6. The following protections against self-incrimination should be provided:

A. Filed affidavits will be under seal for *in camera ex parte* inspection by the court.

B. If the court decides to reveal the intervenor's affidavits, the affiants will have the power to withdraw them blocking revelation.

C. Whether or not withdrawn, the affidavit may not be used in any criminal proceeding against the affiant....

D. Exercise of Fifth Amendment rights to refuse to file any affidavit or to testify at the preliminary hearing or subsequently may lead to an inference against the occupant in construing the evidence but is not itself sufficient proof of lack of innocence....

E. A stay of the forfeiture proceeding to protect Fifth Amendment rights pending completion of all criminal matters is not desirable in this kind of case and Congress seems to have intended that the civil and criminal proceedings advance along parallel tracks with neither one slowing or inhibiting the other....

7. Pending decision, the occupants are not to be dispossessed for reasons based upon 21 U.S.C. § 881.

8. Pending decision, all occupants are enjoined from possessing any drugs or dealing with any drugs within the apartments, the buildings and the land upon which the building rests plus the curtilage, the entire housing project....

9. This order does not limit in any way the enforcement of criminal laws as by search and seizure, arrest, jail or prison, that have the effect of dispossession.

10. This order does not limit in any way the power of the city, state, federal or other authorities or private persons to dispossess for reasons other than seizure pursuant to 21 U.S.C. § 881, such as the failure to pay rent or other violations of the leaseholders.

11. In construing the innocent owner defense, the court expects to use the actual knowledge test supplemented by the equivalence of knowledge test—i.e., deliberately avoiding knowledge by closing one's eyes and ears to what is going on in order to claim ignorance....

Following the preliminary rulings, the Government withdrew its request for interim seizure. Instead, it requested an expedited trial.

In preparation for trial, the claimants sought discovery of police officers who conducted the undercover operations that led to the forfeiture action. The Government objected to the examination of police officers who were still engaged in undercover investigations. Discovery was denied.

In correspondence prior to trial, the United States agreed that if Clara Smith was found to be an innocent owner, it would not attempt to forfeit the interests of the minor intervenors. If Clara Smith did retain the apartment, however, the Government still desired to forfeit any occupancy rights of the apartment's other adult occupants, Juanita Smith, Sylvia Smith and Chenelle Smith. By their action in this litigation, these occupants have effectively claimed an interest in the apartment.

## III. FACTS

Apartment 1–C is a small three bedroom, one bath, one kitchen and one living room unit at the Marcy public housing project in the Williamsburg section of Brooklyn. The leaseholder of record for 32 years has been Mrs. Clara Smith.

### A. *Household Members*

Mrs. Clara Smith, age 51, is a great-grandmother. Most of the children, grandchildren and great-grandchildren bear the surname of Smith. She has six children. Two of her daughters, Juanita Smith, age 36, and Sylvia Smith, age 32, live in the apartment with her.

Juanita Smith is a reformed heroin addict. She has a prior conviction for possession of narcotics for which she received seven days in jail. Juanita Smith's four children reside with her in the apartment. They are Chenelle Smith, age 19; Jamele Smith, age 15; Nicole Smith, age 14; and Ramel Smith, age 11. Ramel was born drug addicted; as a result, Mrs. Clara Smith has legal custody of him. Chenelle Smith has two daughters who live in the

apartment; they are Fatima Smith, age 4, and Jasmine Carr, 22 months.

All of Sylvia Smith's children live with her in the apartment. They are Tara Smith, age 12; Anthony Smith, age 11; Marcus Smith, age 9; Kevin Smith, age 8; Kelima Smith, age 8; and Quentay Smith, age 4.

Mrs. Clara Smith also has legal custody of another three grandchildren whose mother, Pearl Smith, another of her daughters, does not live in the apartment. They are Shawn Lindsy, age 13; Shonda Lindsy, age 9; and Melissa Smith, age 23 months.

The relationship of the family members appears in Claimant's Exhibit Number One, set out below. The exhibit is printed with claimants' permission; they consent to the use of their names and pictures.

OCCUPANTS OF APARTMENT 1–C

CLARA SMITH — 51 YRS.

SYLVIA — 32 YRS.
TARA — 12 YRS.
ANTHONY — 11 YRS.
MARCUS — 9 YRS.
KEVIN — 8 YRS.
KELIMA — 8 YRS.
QUENTAY — 4 YRS.

PEARL — 29 YRS. (DOES NOT LIVE IN APT.)
SHAWN — 13 YRS.
SHONDA — 9 YRS.
MELISSA — 23 MOS.

JUANITA — 36 YRS.
JAMEL — 15 YRS.
NICOLE — 14 YRS.
RAMEL — 11 YRS.
CHENELLE — 19 YRS.
FATIMA — 4 YRS.
JASMINE — 22 MOS.

Claimants' Exhibit No. 1

All the members of the household apparently depend on public assistance for survival. The family's monthly rent of $153.00 is paid directly by the welfare department. Except for the income from drug sales, there was no evidence of other sources of funds.

The matriarchal Smith family organization is becoming more common in this coun-

try. The number of female-headed households "has increased from 1.9 million in 1960 to 5.1 million in 1987." G. Goldberg & E. Kremen, *The Feminization of Poverty: Only in America?* 37 (1990). Since women usually have the primary responsibility for the care of children, they frequently become the custodial or single parent when the marriage breaks up or fails to form. Roughly one in five families with children are now headed by single mothers. *See* G. Goldberg & E. Kremen, *supra*, at 37.

Such a matriarchal family is significantly more likely to live in poverty. Single-mother families constitute approximately three-fifths of all poor families with children. *See, e.g.,* G. Goldberg & E. Kremen, *supra*, at 42; K. Auleta, *The Underclass* 68–70 (1983). This is due, in part, to the more than five-fold increase in unmarried mothers since 1960. Currently, one in four single mothers has never been married. G. Goldberg & E. Kremen, *supra*, at 38.

The effects of poverty are especially damaging in New York City with its high cost of living and scarcity of low-income housing. The number of single-mother families in poverty grew here from approximately 170,000 to 210,000 in the period from 1979 to 1987, an increase of 23.5%. The poverty rate within these families increased from 55.1% to 62.9% during the same period. *See* Community Service Society of New York, *Poverty in New York City, 1985–1988: The Crisis Continues* 11–12 (1989).

The majority of poor children now live with single mothers. In 1987 there were approximately 500,000 poor children living in families in New York City with only their mothers present. These children constituted 74.4% of all poor children in New York City. *Id.* at 36–44.

We can take judicial notice, based upon other cases in our own court as well as information generally available in the New York community, that the incidence of drug addiction and dealing among the poorer members of society, many of them living in ghetto conditions, is greater than that of the population at large. The cheap, potent and highly addictive drug, crack, has exacerbated this problem in recent years. The incidence of AIDS, largely spread from contaminated needles used by the poor, is another terrifying surrogate statistic of the drug culture in New York City.

All of the Smith family residents of apartment 1–C were well-behaved, properly groomed and neatly-dressed while they were in the courtroom. They were noticeably subject to the control and discipline of Mrs. Smith.

The evidence revealed that, on the whole, the children were far better off living with their own extended family, even in the difficult, overcrowded circumstances of Mrs. Smith's apartment, than they would be as atomized individuals in the streets, foster homes or shelters of New York. Exclusion from their apartment risks driving the eighteen Smith family residents far below a minimum standard for civilized living. Congress does not appear to have intended such a draconian result, as indicated in Part IV.E, *infra*.

### B. *Connection of Household to Drug Activity*

On January 31, 1990 an undercover police officer purchased two vials containing crack cocaine from a woman in apartment 1–C. The woman who sold the drugs was identified by the police as Chenelle Smith, Mrs. Smith's granddaughter.

A valid search warrant for the apartment was executed on February 14, 1990. Found in a dresser in a bedroom sometimes occupied by Clara Smith was a blue cookie canister that contained a piece of tin foil with white powder believed to be used in the manufacture of crack, a clear plastic bag filled with empty crack vials, a strainer with the white powder residue, three measuring spoons, and a razor blade. In a second bedroom, the police discovered under a bed a yellow purse containing 35 vials filled with crack. In the same bedroom, a brown paper bag with 100 empty crack vials in plastic bags and a "Gucci" handbag containing more empty crack vials were found.

Such substantial quantities of drugs and drug paraphernalia support the conclusion that the apartment was used to store drugs. It would allow an inference that there had been some packaging of crack there. Certainly there were more drugs and empty vials than would be needed for routine, personal consumption by any users in the apartment.

Following the search, Clara Smith, Chenelle Smith, Juanita Smith, and Sylvia Smith were arrested and indicted. Sylvia Smith and Juanita Smith were convicted of possession of cocaine and sentenced to three years probation. Chenelle Smith was convicted of attempted sale of cocaine and sentenced to five years probation. While in the plea allocution Chenelle Smith only admitted to selling drugs in the building, the circumstances surrounding the sale lead to the conclusion that it occurred from the apartment. The charges against Mrs. Smith were dismissed.

In February 1990 the New York City Housing Authority received a single envelope containing twenty anonymous written complaints. The complaints alleged that a "female black" was selling drugs from apartment 1–C. The complaints also asserted that look-outs and children were involved in the drug sales.

Handwriting and other analysis suggest that the complaints came from one or a few sources. Mrs. Smith attributes them to another family with whom her daughter, Juanita, had a dispute. Apparently, two of Juanita Smith's children, Kayson and Shiniqua, are currently living outside the Smith household with their paternal grandparents who also reside in the Marcy project. The children receive Social Security payments as a result of the death of their natural father. Juanita has requested that the children be returned to her, and a custody battle between her and the grandparents has ensued. In straightened and desperate circumstances disputes over any source of income may result in what would seem to the outsider, a demeaning feud. Compassion and graciousness are not attributes easily afforded where living conditions are barely above those necessary for survival.

At trial the claimants conceded "that there is probable cause to believe that a sufficient nexus to render the property forfeitable exists between the defendant property and criminal activity punishable by more than one year's imprisonment." During the Government's rebuttal, however, Chenelle Smith denied selling crack from the apartment on January 31, 1990. When asked whether she had seen crack in the apartment or whether crack was kept in the apartment, she invoked her Fifth Amendment privilege against self-incrimination.

Her denials are not credible. For the purposes of this litigation, it must be assumed that Chenelle Smith did sell crack from apartment 1–C as alleged.

### C. Clara Smith and the Apartment

The credible evidence showed that Mrs. Smith was almost overwhelmed by the problems of her household. Her day began early in the morning. She took care of the minor children, seeing that they were bathed, dressed and fed before being sent off to school, and trying to supervise them upon their return. She was responsible for all the cooking and cleaning. She rarely left the apartment—usually only when the food stamps arrived to do the grocery shopping for the entire family.

Because of the severe overcrowding, Mrs. Smith has been attempting to obtain a larger apartment for several years. The largest apartment in the Marcy project has four bedrooms and even it would be too small for the household. Sylvia Smith, Juanita Smith and Chenelle Smith are also trying to obtain apartments for their families. It does not appear, however, that they will be successful in the near future.

There is an overwhelming demand for low-income housing in New York City. The Housing Authority owns and operates 318 developments with 179,000 apartments and 600,000 residents. It has a zero vacancy rate. It estimates that in excess of 175,000 families are on a waiting list for housing. See New York City Housing Authority, *55th Annual Report* 6 (1990) (for

the fiscal year ended December 1989) (hereinafter *Housing Report*).

The families are ranked in order of priority. Individuals in overcrowded apartments are next to last in line to receive an apartment. It is estimated that, at present rates, it will take 18 years to place the families on the waiting list in public housing. *See* J. Kozul, *Rachel and Her Children* 17 (1985).

From all indications, it appears that the housing crisis is worsening. The demand for affordable housing is dramatically increasing while its availability is just as sharply decreasing. In New York City federal funding produced an average of 3,000 new apartments a year during the 1950s, 1960s and 1970s. During the entire decade of the 80s, the Housing Authority only received 1,548 new public housing units. *See* Housing Report, *supra*, at 7. With the growth in the number of families living below the poverty line, the current housing shortage will reach even more critical proportions.

At one point, to relieve the cramped conditions, Mrs. Smith ordered Juanita Smith, Chenelle Smith and their children out of the apartment. They were placed in an emergency shelter. Mrs. Smith relented, however, when it became apparent that the condition of the shelters for the homeless were, in her estimation, horrendous. Compassion required that they be permitted to again join the Smith family in their lodging.

Mrs. Smith, the court finds, firmly opposed drug activities by her extended family. She did not tolerate such activities in the apartment since the well-being of the other family members would be jeopardized. She stated repeatedly that she had no knowledge of the presence of any drugs or of any illegal drug activity in her apartment.

When informed by the Housing Authority of anonymous charges of drug sales from her apartment, she confronted the members of her household and satisfied herself that the allegations were not true. As a precaution, she prohibited members of the household from having guests while she was away. She also insisted that only members of her family answer the door. Her testimony is accepted as true.

IV. LAW

The civil drug forfeiture statute, 21 U.S.C. § 881 (1988), creates an *in rem* cause of action for violations of the narcotics laws. The formal defendant in this forfeiture proceeding is apartment 1–C. The statute operates on the legal fiction that " '[i]t is the property which is proceeded against, and ... held guilty and condemned as though it were conscious instead of inanimate and insentient.' " *United States v. United States Currency in the Amount of $228,536.00*, 895 F.2d 908, 916 (2d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 2564, 109 L.Ed.2d 747 (1990) (quoting *Various Items of Personal Property v. United States*, 282 U.S. 577, 581, 51 S.Ct. 282, 283–84, 75 L.Ed. 558 (1931)). If the Government succeeds in a forfeiture proceeding, "all right, title, and interest in the property used to facilitate a drug transaction shall vest in the United States...." 21 U.S.C. § 881(h).

A. *Public Housing Forfeiture*

Forfeiture is a powerful weapon in the war on drugs. It allows the Government to "seize the profits and proceeds of illegal drug trafficking, as well as the currency and property used in connection with money laundering and drug violations." United States Department of Justice, *Drug Trafficking: A Report to the President of the United States* 49 (1989).

The forfeiture provision under which the Government is proceeding provides:

The following shall be subject to forfeiture to the United States and no property right shall exist in them: ....

(7) All real property, including any right, title, and interest (including any leasehold interest) in the whole of any lot or tract of land and any appurtenances or improvements, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this title punishable by more than one year's imprisonment, except that no property shall be forfeited

under this paragraph, to the extent of an interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.

21 U.S.C. § 881(a).

Section 5105 of the Anti–Drug Abuse Act of 1988, Pub.L. No. 100–690, 102 Stat. 4181 (1988), amended section 881(a)(7) to add leasehold interests to the description of property subject to forfeiture. The amendment represented a codification of "guidelines granting public housing agencies authority to evict tenants if they, their families, or their guests engage in drug-related criminal activity." 134 *Cong.Rec.* S. 17,360 (daily ed. Nov. 10, 1988). By including public housing leases, Congress made clear that the United States assumed the power "to seize housing units from tenants who violate drug laws...." *Id.* Congress also amended the public housing statute to require that leases must prohibit drug related criminal activity and that such activity is grounds for eviction. Anti–Drug Abuse Act § 5101.

The high concentration of poverty has made public housing developments especially vulnerable to drugs and drug dealing. Low-income housing has been transformed from a place to live to "a staging area for the distribution of drugs and the violence related to drug trafficking and consumption." Office of National Drug Control Policy, *National Drug Control Strategy* 64 (Feb. 1991).

Frustrated in its efforts to curtail the proliferation of illegal drugs in public housing, Congress sought to create a mechanism by which tenants who violate the narcotics laws could be removed. The problems surrounding existing state and federal eviction proceedings necessitated the creation of an efficient and effective method to remove drug dealers and return the housing projects to law-abiding tenants.

Safe, drug-free public housing has become one of the top priorities of the National Drug Control Strategy. Several programs have been implemented to achieve this objective. In June of 1990, the Depart-

ments of Justice and Housing and Urban Development (HUD) announced a joint program, the Public Housing Asset Forfeiture Demonstration to identify drug dealers and remove them from public housing. State public housing agencies and local police gathered evidence and presented it to the appropriate United States Attorney. The Government, in turn, obtained an *ex parte* seizure warrant to be promptly executed by the United States Marshal.

HUD and Justice developed the following guidelines for Public Housing Authorities and United States Attorneys to use in selecting cases:

(1) The violator should be the leaseholder of the property. (The term "violator" refers to the person whose actions give rise to the forfeiture.)

(2) Compelling evidence should be developed that the violator participated in at least two felony drug offenses.

(Drug purchases by undercover law enforcement officials from individual notorious drug dealers or evidence obtained pursuant to a search warrant would satisfy this criteria.)

(3) Where appropriate, the violator should be prosecuted by local, state or federal authorities for drug activities.

(4) The property should be an open and notorious site of drug distribution.

(5) Careful consideration should be given to factors involving family members of the violator and other registered occupants of the property. Those involved in this effort will seek to minimize the impact of the Government's actions on minors and/or the elderly, should they be [a]ffected by the action. Appropriate human resource services support (i.e. child welfare, emergency shelter, etc.) should be prearranged where minors or the elderly are [a]ffected.

HUD has modified the grounds for denial or termination of housing assistance to emphasize that drug-related criminal activity by members of the household, guests or other persons under a tenant's control will result in a loss of assistance. *See* 55 Fed. Reg. 28,538 (1990) (to be codified at 24 C.F.R. §§ 882.118, 882.210, & 882.413). It

has also proposed revisions in the standard lease to provide that the same drug-related activity is a sufficient basis for eviction. *See* 56 Fed.Reg. 6,248 (1991) (to be codified at 24 C.F.R. § 966) (proposed February 14, 1991).

States have been encouraged to take legislative initiatives to eliminate drug dealing from housing projects. Several states have passed laws that mandate a tenant's eviction from public housing if he or she is convicted of a drug offense on the premises. *See* Office of National Drug Control Policy, *State Drug Control Status Report* 11 (Nov.1990) (Arizona, Arkansas, California, Massachusetts, Missouri, Nevada & New Jersey).

New York has developed such a program. It evicts drug dealers under the Bawdy House Law, N.Y. Real Prop. Acts § 715, and private landlords bring nuisance-holdover proceedings to remove the drug dealers. *See, e.g., Kings County District Attorney's Office v. Underwood*, 143 Misc.2d 965, 543 N.Y.S.2d 247 (N.Y.Civ.Ct. 1989). The landlords face a $5000.00 fine if they refuse to bring the nuisance action. This program has resulted in 220 evictions. *See Report and Recommendation to the Mayor on Drug Abuse in New York City* 39 (May 1990).

B. *Preseizure Notice and Hearing Required*

The federal public housing demonstration has been the subject of legal challenge in the federal courts. Three days after its initiation, a federal judge entered a preliminary injunction prohibiting seizure of apartments without prior notice or an opportunity to be heard. A permanent injunction was entered on December 19, 1990. *See Richmond Tenants Org., Inc. v. Kemp*, 753 F.Supp. 607, 610 (E.D.Va.1990). The Department of Justice and HUD are in the process of revising the case criteria to provide for preseizure notice and hearing.

The court in *Richmond Tenants Organization* relied on the decision of the Court of Appeals for the Second Circuit in *United States v. Premises and Real Property at 4492 S. Livonia Rd., Livonia, New York*,

889 F.2d 1258 (2d Cir.1989), *reh'g denied*, 897 F.2d 659 (2d Cir.1990). There, the Court of Appeals held that the forfeiture of an individual's home without prior notice and hearing would be unconstitutional. *Id.* at 1262–66.

The common law has long recognized the special significance of an individual's home. Maintaining the sanctity and privacy of the home was one of the primary purposes of the Fourth Amendment. *See, e.g., Welsh v. Wisconsin*, 466 U.S. 740, 748, 104 S.Ct. 2091, 2096–97, 80 L.Ed.2d 732 (1984); *Payton v. New York*, 445 U.S. 573, 578, 100 S.Ct. 1371, 1376, 63 L.Ed.2d 639 (1980). The expectation of privacy and freedom from Government intrusion in one's home merits the additional protections of preseizure notice and hearing. *See 4492 S. Livonia Rd.*, 889 F.2d at 1264.

■■■■ There is persuasive reason to extend the procedural safeguards of *4492 S. Livonia Rd.* to apartment forfeitures. A public housing tenant's interest in his apartment is a property interest protected by the Constitution. *Escalera v. New York City Housing Authority*, 425 F.2d 853, 861 (2d Cir.), *cert. denied*, 400 U.S. 853, 91 S.Ct. 54, 27 L.Ed.2d 91 (1970). The expectation of uninterrupted occupation and privacy exist whether the home is held in fee or by lease. A leasehold is subject to constitutional protections against arbitrary forfeiture to the Government. *Cf. Alamo Land and Cattle Co. v. Arizona*, 424 U.S. 295, 303, 96 S.Ct. 910, 916, 47 L.Ed.2d 1 (1976) (leasehold is form of property protected against uncompensated taking). To be constitutional, apartment forfeiture proceedings require prior notice and hearing. *See Richmond Tenants Org., Inc.*, 753 F.Supp. at 610; *United States v. Leasehold Interest in Property Located at 850 S. Maple, Ann Arbor, Michigan*, 743 F.Supp. 505, 508–09 (E.D.Mich.1990).

C. *Procedures to Obtain Forfeiture*

Section 881 incorporates by reference the rules and procedures governing forfeitures for customs violations and admiralty and maritime claims. *See* 21 U.S.C. § 881(b), (d). Section 881(b) allows for the seizure of

property under a variety of procedures which do not provide for prior notice or an opportunity to be heard.

The requirements of *4492 S. Livonia Rd.* alter the summary procedures typically employed by the Government when seizing personal property under the drug forfeiture laws. The Second Circuit has not yet offered guidance on the nature of the preseizure hearing or the appropriate method of notifying potential claimants. *See United States v. Premises and Real Property at 4492 S. Livonia Rd., Livonia, New York*, 897 F.2d 659 (2d Cir.1990) (on petition for rehearing). It found such instruction unnecessary since only the interim forfeiture was held to be unconstitutional. The final forfeiture of the home was upheld after a trial with evidence not derived from the unconstitutional seizure.

### 1. Adequate Notice

■ Notice here was more than sufficient to apprise any potential claimant to the apartment of the initiation of forfeiture proceedings. The Government began this forfeiture proceeding by filing a verified complaint *in rem* pursuant to Rule C(3) of the Supplemental Rules for Certain Admiralty and Maritime Claims and 21 U.S.C. § 881(b). It served on the leaseholder of the apartment or a responsible family member residing in the apartment a copy of the order to show cause, the verified complaint *in rem*, and attached declarations. Subsequently, a supplemental warrant for arrest *in rem* was affixed in a conspicuous location and served on someone in the apartment. This method of service is authorized by admiralty and maritime rules. *See* Supplemental Rule E(4)(b). In addition, the Government published notice of the arrest of the defendant premises for three consecutive days in a newspaper of general circulation within this district. *Cf.* 21 C.F.R. § 1316.75 (providing for publication notice where amount forfeited is less than $100,-000.00). Every resident in the apartment was fully aware of the Government's position.

### 2. Claimants' Objection

■ Once forfeiture proceedings are initiated, persons who wish to contest forfeiture must file claims within 10 days, or longer if the court allows. *See* Supplemental Rule C(6). Potential claimants must file a verified claim "on oath or solemn affirmation" and must "state the interest in the property by virtue of which the claimant demands its restitution and the right to defend the action." Supplemental Rule C(6); *see Mercado v. United States Customs Serv.*, 873 F.2d 641, 645 (2d Cir.1989).

Instead of filing a verified claim, Clara Smith sought to intervene in the forfeiture proceeding by filing a verified complaint on behalf of herself and the minors residing in the apartment. While not styled as a typical proof of claim, the complaint plainly states that it is to serve as a proof of claim under Supplemental Rule C(6).

■ The filing of a verified intervenor complaint meets the requirements of Supplemental Rule C(6). Clara Smith has sworn to the verified complaint which states she is the leaseholder of record and that she asserts the "innocent owner" defense for all intervenors. This is sufficient to give her standing to contest the forfeiture action. Since the court on July 30, 1990 stayed further proceedings until the complaints were filed, there is no question that the filing of the claim was timely.

### 3. Scope of Preseizure Hearing

■ Since, at first, the Government sought interim seizure of the apartment, a preseizure hearing became necessary. *See United States v. Premises and Real Property at 4492 S. Livonia Rd., Livonia, New York*, 889 F.2d 1258, 1265 (2d Cir.1989), *reh'g denied*, 897 F.2d 659 (2d Cir.1990). The Government maintains that the only issue at such a hearing is whether there is "probable cause to believe that the property is subject to civil forfeiture...." 21 U.S.C. § 881(b). It concedes that such a limiting of the issues at the hearing will preclude the claimants from asserting defenses to forfeiture. To allow the claimants to assert defenses at the preseizure hearing, the Government argues, would be unnecessarily burdensome on prosecutors and would be contrary to Congress' desire

to create an efficient mechanism to evict drug dealers.

While *4492 S. Livonia Rd.* does not provide instruction on the scope of the preseizure hearing, the requirement of a hearing implies that the hearing be meaningful. *See Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965) (hearing must be at meaningful time and in meaningful manner); *cf. Goldberg v. Kelly*, 397 U.S. 254, 267, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287 (1970) (pre-termination hearing should protect a welfare recipient against erroneous termination of benefits); *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 343, 89 S.Ct. 1820, 1823, 23 L.Ed.2d 349 (1969) (Harlan, J., concurring) ("[D]ue process is afforded only by the kinds of 'notice' and 'hearing' which are aimed at establishing the validity, or at least the probable validity, of the underlying claim ... *before* [a person] can be deprived of his property....") (emphasis in original).

If the preseizure hearing only involved the issue of probable cause, there would be little reason for claimants to be present. All the evidence on probable cause is in the Government's possession. Claimants could only challenge its validity. Owners and occupants who have a viable defense to forfeiture could be ousted from their homes until they were given the opportunity to defeat the forfeiture proceeding by successfully establishing their defenses at trial. This is not sufficient protection for their substantial interest in their homes.

To be meaningful, the hearing must at least include an opportunity for a claimant to establish defenses to forfeiture. *Cf. United States v. Monsanto*, 924 F.2d 1186, 1203 (2d Cir.1991) (anomalous to require hearing and then circumscribe its scope). Without such an opportunity, there would be a serious risk that an owner or occupant could be erroneously deprived of a domicile.

A colorable innocent owner defense at the preseizure hearing should prevent immediate forfeiture. The Government should not be allowed to seize the property and to evict the tenants, only to have them regain the property if they are successful at trial.

The increased burden on the Government is minimal in comparison with the enormous and potentially irreparable harm that would result from an erroneous eviction from an apartment. The only harm to the Government is preparing its case earlier than expected and possibly having to wait until trial to obtain the apartment. There is no risk that the apartment will be sold, hidden or absconded with prior to the trial.

Clara Smith and her family depend on public assistance for survival. If they were evicted from public housing, they would probably not be able to afford another suitable apartment. They would likely join the ranks of thousands of other homeless families in New York City. *See, e.g.,* J. Kozul, *Rachel and her Children* 15–21 (1985). The children might even be placed in separate foster homes until proper housing was available. If the Government were wrong, either because the apartment was not used illegally or because Clara Smith was an innocent owner, there would be no way to remedy potentially tragic results.

The Government's offer of an occupancy agreement, which would allow the claimant to remain at the premises prior to trial, would not minimize the significant risk of harm. A claimant's interest in her home is "not in any way diminished by [an] occupancy agreement," since that agreement is entered into with the government as a matter of "grace, not entitlement." *United States v. Premises and Real Property at 4492 S. Livonia Rd., Livonia, New York*, 889 F.2d 1258, 1265 (2d Cir.1989), *reh'g denied*, 897 F.2d 659 (2d Cir.1990). In addition, the Government conceded that it does not always enter into occupancy agreements with claimants.

Once the court preliminarily ruled that the claimants were entitled to assert defenses to forfeiture at an interim seizure hearing, the Government agreed to proceed with an expedited trial.

### D. *Probable Cause to Forfeit*

■ Property is subject to forfeiture upon a showing of probable cause that it

was used to facilitate a narcotics crime. *See United States v. Certain Real Property and Premises Known as 418 57th Street Brooklyn, New York,* 922 F.2d 129, 131 (2d Cir.1990); *United States v. Premises and Real Property at 4492 S. Livonia Rd., Livonia, New York,* 889 F.2d 1258, 1267 (2d Cir.1989), *reh'g denied,* 897 F.2d 659 (2d Cir.1990).

■ Probable cause in this context means that "the government must have reasonable grounds, rising above the level of mere suspicion, to believe that certain property is subject to forfeiture." *4492 S. Livonia Rd.,* 889 F.2d at 1267; *see United States v. One Parcel of Property Located at 15 Black Ledge Dr., Marlborough, Connecticut,* 897 F.2d 97, 101 (2d Cir.1990); *United States v. Banco Cafetero Panama,* 797 F.2d 1154, 1160 (2d Cir.1986). This standard of proof is less than the preponderance of evidence test required in typical civil proceedings. *United States v. All Right, Title and Interest in Real Property Known as 303 W. 116th St., New York, New York,* 901 F.2d 288, 291 (2d Cir.1990); *Banco Cafetero Panama,* 797 F.2d at 1160.

■ The forfeiture statute, as interpreted by the Court of Appeals, apparently enables the Government to remove residents from their homes and apartments without proving at least that it is more likely than not that they engaged in, or permitted, drug-related criminal activity on the premises. *See 4492 S. Livonia Rd.,* 889 F.2d at 1267–68. The court is bound by this decision allowing serious constitutional property deprivations without substantial proof until such time as the appellate court revisits the issue. *See* Section E.1, *infra.*

■ In their opening statement, the claimants conceded that probable cause existed to forfeit the property. Claimants are bound by their admission. Nevertheless, after the Government rested, the claimants moved to dismiss the complaint on the grounds that the Government failed to establish probable cause that the apartment was "subject to forfeiture."

Claimants argue that the proof at trial established that Juanita Smith and Sylvia Smith pled guilty only to possession of narcotics in the apartment. Since this offense is not punishable by more than one year's imprisonment under federal law, it can not serve as a basis for forfeiture. *See* 21 U.S.C. § 844 (simple possession not punishable by greater than one year); 21 U.S.C. § 881(a)(7) (requiring offense punishable by greater than one year).

Claimants concede that Chenelle Smith's guilty plea to attempted sale of narcotics would be sufficient to warrant forfeiture. They submit, however, that since the plea allocution does not specify that the attempted sale occurred in or from the apartment, it cannot be connected with the apartment and serve as a basis for forfeiture.

■ Claimants' position, while superficially compelling, does not withstand analysis. A state criminal conviction, by itself, may suffice to demonstrate probable cause for forfeiture. Factual admissions in a trial transcript or in a plea allocution might also establish the grounds necessary to obtain forfeiture. *See United States v. All Right, Title & Interest in Real Property and Building Known as 303 W. 116th St., New York, New York,* 901 F.2d 288, 293 (2d Cir.1990); *United States v. Premises and Real Property at 4492 S. Livonia Rd., Livonia, New York,* 889 F.2d 1258, 1267 (2d Cir.1989), *reh'g denied,* 897 F.2d 659 (2d Cir.1990). Civil forfeiture does not require a prior criminal conviction or even a prior criminal proceeding. *See 303 West 116th Street,* 901 F.2d at 292.

■ To obtain forfeiture, the Government does not need to make a connection between specific individuals and particular drug transactions. *United States v. Banco Cafetero Panama,* 797 F.2d 1154, 1160 (2d Cir.1986). It need only show a "sufficient nexus" between drug activity and the property itself. *See 4492 Livonia Rd.,* 889 F.2d at 1269–70; *Banco Cafetero Panama,* 797 F.2d at 1160; *United States v. One 1974 Cadillac Eldorado,* 575 F.2d 344, 345 (2d Cir.1978) (per curiam) (requiring a "sufficient nexus").

A small quantity of drugs found in the apartment or a single drug sale might create the probable cause necessary to support forfeiture. *See United States v. One 1986 Mercedes Benz*, 846 F.2d 2, 4–5 (2d Cir.1988) (forfeiture may be predicated on a minute quantity of drugs); *One 1974 Cadillac Eldorado*, 548 F.2d 421, 425 (same); *United States v. Certain Real Property and Premises Known as 38 Whalers Cove Drive, Babylon, New York*, 747 F.Supp. 173, 176 (E.D.N.Y.1990) (evidence of two drug sales supported forfeiture of home).

It is not necessary to decide whether the minute quantities of drugs which will suffice to deprive an owner of his Cadillac is sufficient to put a poor person out of a housing project and into the street. The quantities of drugs and the sale from apartment 1–C make out a *prima facie* case of sustained substantial violations of drug laws.

Here the New York City Police Department's undercover buy-report and laboratory analysis established that crack was sold from the apartment on January 31, 1990. The sale of any amount of crack is punishable by more than one year's imprisonment. *See* 21 U.S.C. § 841(a); 21 U.S.C. 841(b)(1)(C). This sale is sufficient to make property "subject to forfeiture" within the meaning of 21 U.S.C. § 881(a)(7). It is also clear that Chenelle Smith sold the crack to the undercover police officer. In a complaint follow-up report, the undercover officer identified Chenelle as the woman who sold crack to him from the apartment.

 The claimants object to the Government's use of hearsay in establishing probable cause. Reliable hearsay evidence may be used to establish probable cause. *United States v. 228 Acres of Land and Dwelling Located on Whites Hill Rd. in Chester, Vermont*, 916 F.2d 808, 814 (2d Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 972, 112 L.Ed.2d 1058 (1991); *United States v. Premises and Real Property at 4492 S. Livonia Rd., Livonia, New York*, 889 F.2d 1258, 1267 (2d Cir.1989), *reh'g denied*, 897 F.2d 659 (2d Cir.1990). The buy report, laboratory analysis and follow-up report are sufficient-

ly reliable to establish probable cause that the property is subject to forfeiture. *Cf. Fed.R.Evid.* 803(6), (8)(C) & (23).

 The search of the apartment on February 14, 1990 produced additional evidence that the apartment was involved in drug activity. The police recovered 35 vials filled with crack, over one hundred empty crack vials, and some drug paraphernalia. Probable cause can be established by "such circumstantial evidence, even when no actual transaction was witnessed." *4492 S. Livonia Rd.*, 889 F.2d at 1269; *United States v. $2,500 in United States Currency*, 689 F.2d 10, 16 (2d Cir.1982), *cert. denied*, 466 U.S. 994, 104 S.Ct. 2376, 80 L.Ed.2d 848 (1984).

 The Government is not even required to prove that a crime was actually committed in the apartment. Forfeiture is warranted if the premises had been used "to facilitate" drug activity. *See* 21 U.S.C. 881(a)(7). A common definition of facilitate is " 'to make easier.' " *United States v. Certain Real Property and Premises Known as 38 Whalers Cove Drive, Babylon, New York*, 747 F.Supp. 173, 176 (E.D. N.Y.1990) (quoting *The Random House Dictionary of the English Language* 840 (1969)).

The large number of crack vials and other drug paraphernalia in the apartment coupled with Chenelle Smith's admission in her plea allocution that she sold crack at the housing project creates probable cause to believe that the apartment was used to store or safekeep crack and possibly to package it. Having a place to package or store the crack would certainly make its sale easier. This circumstance alone is sufficient to establish the probable cause necessary to warrant forfeiture.

### E. *Defenses to Forfeiture*

 Once the Government establishes probable cause, the burden of proof then shifts to the claimant to the property to establish, by a preponderance of the evidence, that the use of the property was such that it is not subject to forfeiture. *See United States v. 228 Acres of Land*

*and Dwelling Located on Whites Hill Rd. in Chester, Vermont,* 916 F.2d 808, 811–12 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 972, 112 L.Ed.2d 1058 (1991); *United States v. Premises and Real Property at 4492 S. Livonia Rd., Livonia, New York,* 889 F.2d 1258, 1267 (2d Cir.1989), *reh'g denied,* 897 F.2d 659 (2d Cir.1990); *cf.* 19 U.S.C. § 1615 (1988). The claimant can meet this burden by proving "either that the property was not used unlawfully ... or that the illegal use was without the claimant's knowledge or consent." *4492 S. Livonia Rd.,* 889 F.2d at 1267 (citations omitted); *see United States v. Parcel of Real Property Known as 6109 Grubb Rd., Mill Creek Township, Erie County, Pennsylvania,* 886 F.2d 618, 623 (3d Cir.1989); *United States v. One 56–Foot Motor Yacht Named the Tahuna,* 702 F.2d 1276, 1287 (9th Cir.1983).

### 1. Burdens of Proof

Statutory shifting of the burden of proof stacks the deck heavily in favor of the Government. It can obtain forfeiture by simply showing—by less than a preponderance of the evidence—that the property was used illegally. For a claimant to remain in her home, however, she must establish a defense to forfeiture by a preponderance of the evidence.

On constitutional as well as policy grounds there is doubt about the propriety of shifting the burden of proof in quasi-criminal proceedings to leaseholders. Characterizing this action as civil by statute does not negate its essentially punitive nature as part of the broad initiatives taken to combat drugs. The law would be much more comfortable with a forfeiture scheme that, at least in the case of homes, placed the entire burden on the Government to establish that forfeiture is warranted with a standard that is higher than a preponderance.

Such a higher standard may be constitutionally mandated. To determine the appropriate standard of proof, due process requires that private and public interests be given weight and a societal judgment be made "about how the risk of error should

be distributed between the litigants." *Santosky v. Kramer,* 455 U.S. 745, 755, 102 S.Ct. 1388, 1395, 71 L.Ed.2d 599 (1982). This inquiry has produced a higher than preponderance burden of proof under a variety of conditions. *See, e.g., Santosky,* 455 U.S. at 768–69, 102 S.Ct. at 1402–03 (clear and convincing evidence in parental rights proceeding); *Woodby v. Immigration & Naturalization Serv.,* 385 U.S. 276, 285–86, 87 S.Ct. 483, 487–88, 17 L.Ed.2d 362 (1966) (clear, unequivocal and convincing evidence in deportation proceeding); *United States v. Fatico,* 458 F.Supp. 388, 404–405 (1978), *aff'd,* 603 F.2d 1053 (2d Cir.1979), *cert. denied,* 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980). *Santosky* is particularly relevant in the instant case since forfeiture would be likely to break up the Smith family by putting the minor children in foster homes or shelters.

There is ample justification for such a higher burden in light of the important role of decent housing in maintaining human dignity and the strong likelihood that the loss of public housing will result in homelessness. In this case, however, we need not reach the difficult issue of the appropriate burden of proof because Clara Smith has established, beyond any doubt, let alone by a preponderance, a valid defense to forfeiture.

### 2. Innocent Ownership

While Congress designed the drug forfeiture statutes to be a powerful weapon in the war on drugs, it had no desire to see innocent owners lose their property. The statute allows a claimant to avoid forfeiture by establishing that she had no knowledge of narcotics activity or, if she had knowledge, that she did not consent to it. *See* 21 U.S.C. § 881(a)(7); *United States v. 141st Street Corp.,* 911 F.2d 870, 878 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1017, 112 L.Ed.2d 1099 (1991).

The court tentatively ruled that the innocent owner defense's lack of knowledge prong should be construed to mean lack of "willful blindness." The absence of consent prong has been construed to require a claimant to show that "he did all that rea-

sonably could be expected to prevent the illegal activity once he learned of it." *141st Street Corp.*, 911 F.2d at 879. Claimant Clara Smith has successfully established both prongs of the innocent owner defense.

▮ The civil forfeiture statute makes owners, including lessors, responsible for their property. Owners must take "basic investigatory steps" and not deliberately avoid knowledge of wrongdoing occurring on the property. *See United States v. St. Michael's Credit Union*, 880 F.2d 579, 584–85 (1st Cir.1989); *United States v. One 1988 Honda Accord*, 735 F.Supp. 726, 730 (E.D.Mich.1990). In light of the enormous drug problem and the statute's intended potency, lack of knowledge should be construed to mean absence of "willful blindness." *See United States v. One Parcel of Real Estate at 5745 N.W. 110 St., Miami, Florida*, 721 F.Supp. 287, 290 (S.D. Fla.1989), *aff'd*, 914 F.2d 268 (11th Cir. 1990) ("deliberate avoidance of positive knowledge is the equivalent of knowledge").

Even under the more stringent "willful blindness" standard, Clara Smith established that she lacked knowledge of drug activity in the apartment. She emphasized repeatedly that she had no knowledge of the presence of any drugs or of any illegal activity in her apartment. She also stated that she did not know of any possible illegal uses of the drug paraphernalia recovered in the search of the apartment.

When presented with anonymous charges of drug trafficking in her household, Clara Smith promptly investigated the allegations. She confronted her family members and questioned them about drug activity. She also took precautionary steps to prevent visitors from engaging in drug dealing.

Her testimony is not incredible, as the Government claims. The apartment does not appear to be a "crack house" where widespread, notorious drug activity occurred. The Government only established one drug sale and the presence of hidden drug paraphernalia. The crack vials, though large in number, were not strewn through the apartment, but rather concealed from sight. Given Mrs. Smith's other burdens, she could easily have been unaware of the illegal activities. In view of her expressed antipathy to drugs, it would be reasonable to assume that her children and grandchildren would try to keep Mrs. Smith in the dark about their proscribed activities. We take judicial notice of the widespread lack of knowledge of childrens' drug activities in all kinds of families.

Since Mrs. Smith lacked knowledge of the drug activity, she has successfully established the innocent owner defense and is entitled to retain the apartment. There is no need to inquire into whether she consented to the activity since lack of consent can be presumed from her absence of knowledge. *See United States v. Certain Real Property and Premises, Known as 418 57th Street, Brooklyn, New York*, 922 F.2d 129, 131 (2d Cir.1990); *United States v. 141st Street Corp.*, 911 F.2d 870, 878 (2d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1017, 112 L.Ed.2d 1099 (1991). In any event, she did take reasonable steps, under the circumstances, to prevent drug activity in the apartment.

### 3. No Unlawful Activity

▮ Claimants also maintain that forfeiture is not warranted because the Government failed to prove that the apartment was involved in drug activity. Claimants offer no credible evidence to support a finding that the apartment was not used illegally. Instead, they have attacked the adequacy of the Government's probable cause showing. This is not sufficient to carry their burden by a preponderance of the evidence. *See United States v. 228 Acres of Land and Dwelling Located on Whites Hill Rd. in Chester, Vermont*, 916 F.2d 808, 812 (2d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 972, 112 L.Ed.2d 1058 (1991).

Chenelle Smith's testimony during the Government's rebuttal was the only evidence offered that the apartment was not connected with drug activity. She denied selling crack from the apartment on January 31, 1990. This limited denial is not inconsistent with crack being sold from the

apartment by her on other occasions or by someone else on January 31st. Moreover, the credibility of the denial is doubtful in light of her earlier admission during her guilty plea that she sold crack in the building. *Cf. United States v. Parcel of Land & Buildings Located Thereon at 40 Moon Hill Rd., Northbridge, Massachusetts,* 721 F.Supp. 1 (D.Mass.1988), *aff'd,* 884 F.2d 41 (1st Cir.1989) (claimant estopped by plea of guilt from denying involvement in drug activity). The Government's evidence and the absence of credible testimony to the contrary require a finding that Chenelle Smith did sell crack on January 31, 1990 from the apartment.

### 4. Fifth Amendment

■ Chenelle Smith's remaining testimony was unhelpful. When asked whether she had seen crack in the apartment or whether she ever possessed crack, she invoked her Fifth Amendment privilege against self-incrimination. An adverse inference from invocation of the privilege, taken with other evidence, would strongly indicate that drug activity did occur in the apartment.

Whether an adverse inference can be drawn from invocation of the Fifth Amendment privilege in a forfeiture proceeding is a question left open by the Court of Appeals for the Second Circuit. *See United States v. One Parcel of Property Located at 15 Black Ledge Drive, Marlborough, Connecticut,* 897 F.2d 97, 103 (2d Cir.1990). This question also appears to have divided the Courts of Appeals. *Compare United States v. A Single Family Residence and Real Property Located at 900 Rio Vista Blvd., Ft. Lauderdale,* 803 F.2d 625, 629 n. 4 (11th Cir.1986) (allowing adverse inference) *with United States v. United States Currency,* 626 F.2d 11, 14–16 (6th Cir.) *cert. denied* 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 290 (1980) (implying adverse inference is improper).

Simultaneous civil forfeiture and threat of parallel criminal actions often places claimants to property in a difficult and untenable position. If the Government establishes probable cause to believe that the property is subject to forfeiture, the claim-

ants can either present a defense to forfeiture or lose their property. At the same time, a claimant may be facing criminal prosecution by state or federal authorities for the same drug-related criminal activity that has made the property forfeitable. This choice, under some circumstances, substantially impinges on a claimant's Fifth Amendment privilege against self-incrimination.

Courts have adopted the pragmatic dilemma-resolving principle that in a civil forfeiture action, attempts should be made to accommodate a claimant's Fifth Amendment privilege. *See United States v. Parcels of Land,* 903 F.2d 36, 44 (1st Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 289, 112 L.Ed.2d 243 (1990); *United States v. $250,000 in U.S. Currency,* 808 F.2d 895, 901 (1st Cir.1987); *United States v. United States Currency,* 626 F.2d 11, 15–18 (6th Cir.), *cert. denied,* 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 290 (1980).

In this case, the court allowed the filing of sealed affidavits. The affidavits could be withdrawn by the affiants if at some later time the court decided to unseal them. At no time could the affidavits be used in any criminal proceeding against the affiants. While the court initially ruled that a stay of the forfeiture proceeding was not warranted, it later stayed any forfeiture actions until pending criminal prosecutions were completed. These actions were more than sufficient to protect the claimants' Fifth Amendment rights.

Chenelle Smith did not file an affidavit under seal. Her failure to use the procedures designed to protect her Fifth Amendment privilege obviates any further inquiry into whether the privilege's exercise was hindered by the forfeiture proceedings. Since her testimony does not vitiate the Government's probable cause case, the court does not need to, and does not rely on a negative inference from the invocation of her Fifth Amendment privilege to find that drugs were sold from the apartment.

### F. *Forfeiture of Other Claimants' Interests*

■ Since Clara Smith has successfully established the "innocent owner" defense,

the Government has agreed not to proceed against the minor residents on whose behalf Clara Smith intervened. It has requested, however, that the occupancy interests of Chenelle Smith, Sylvia Smith and Juanita Smith be forfeited and an order of eviction be entered. Alternatively, the Government has requested that the court issue an injunction prohibiting the claimants and other occupants of the apartment from using it to commit or facilitate narcotics offenses.

 Clara Smith's establishing the "innocent owner" defense prevents the Government from forfeiting the apartment to the extent of her interest. *See* 21 U.S.C. § 881(a)(7). An owner's interest in property is defined by state law rather than federal law. *See United States v. Lot 9, Block 2 of Donnybrook Place, Harris County, Texas,* 919 F.2d 994, 1000 (5th Cir.1990); *United States v. Real Property Located at 2525 Leroy Lane, W. Bloomfield, Michigan,* 910 F.2d 343, 349 (6th Cir.1990); *United States v. One Parcel of Real Estate at 11885 S.W. 46 St., Miami, Florida,* 715 F.Supp. 355, 359 (S.D.Fla. 1989); *United States v. One Single Family Residence with Outbuildings Located at 15621 S.W. 209th Ave., Miami, Florida,* 699 F.Supp. 1531, 1536 (S.D.Fla.1988), *aff'd,* 894 F.2d 1511 (11th Cir.1990).

Here, Clara Smith is the "owner" of the leasehold. The remaining seventeen members of her family are entitled to possess, use and occupy the premises both as a consequence of her ownership and their residence. *See Clarke v. Morris,* 46 Misc.2d 476, 477, 259 N.Y.S.2d 539, 540–41 (Civ.Ct.N.Y. County 1965).

Since Chenelle Smith did sell drugs from the apartment, her independent interest in the property is subject to forfeiture. To the extent that she has any legal right to remain in the premises, that right, however defined, has been lost. Despite the demise of Chenelle Smith's property right in the apartment, her children, that is to say, the great-grandchildren of Clara Smith, retain their independent right to remain as residents and guests of their great-grandmother.

It is not necessary to decide if Chenelle Smith is barred from the hospitality and protection of her grandmother, Clara Smith, who does have a right to remain in the apartment. These are matters best left to regulation by the Housing Authority which has grievance procedures for dealing with situations such as these. *See* New York City Housing Authority Management Manual, Chap. VII, Section C.6.

This same relief is not available against Sylvia Smith or Juanita Smith. The evidence against them only establishes that they possessed crack. This is not sufficient to make their legal rights in the apartment subject to forfeiture.

The Government requests an injunction prohibiting the claimants or other occupants from using the apartment to commit or facilitate narcotics offenses. Such an injunction is authorized by statute. *See* 21 U.S.C. § 882 (1988). How such an injunction can be enforced apart from state and federal criminal statutes is not clear. The statute arguably provides for an injunction. The Government has established the prerequisites for obtaining an injunction. The injunction is granted.

## V. CONCLUSION

Even though the Government established probable cause to believe that the property is subject to forfeiture, Clara Smith's establishment of the "innocent owner" defense entitles her to retain her home. Chenelle Smith, however, has lost her property right to remain in the apartment. It is unnecessary to reach claimants' constitutional challenges to the forfeiture statutes. An injunction against use of the apartment to store drugs or as a base for sale of drugs is granted. Submit an appropriate judgment on five days notice. No costs or disbursements are granted to either party.

So ordered.